AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America

v.

JOSE LUIS ALONSO,

Defendant(s)

Case No.  2:22-mj-04213-DUTY

**LODGED**
CLERK, U.S. DISTRICT COURT
10/26/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: VAV    DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT

**10/26/22**

CENTRAL DISTRICT OF CALIFORNIA
BY: ___slo___ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of May 26, 2022 in the county of Los Angeles in the Central District of California, the

defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922 (g)(1) | Felon in Possession of a Firearm |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

*Jannah R. Holder*
*Complainant's signature*

Jannah R. Holden, ATF Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: ___10/26/22___

*John E. McDermott*
*Judge's signature*

City and state:  Los Angeles, California

Hon. John E McDermott, U.S. Magistrate Judge
*Printed name and title*

AUSA: Lyndsi Allsop, x3165

## <u>AFFIDAVIT</u>

I, Jannah R. Holden, being duly sworn, declare and state as follows:

## I. <u>PURPOSE OF AFFIDAVIT</u>

1. This affidavit is made in support of a criminal complaint and arrest warrant against JOSE LUIS ALONSO ("ALONSO") for a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm.

2. This affidavit is also made in support of an application for a warrant to search 6431 Santa Fe Avenue, Huntington Park California 90255 (the "SUBJECT PREMISES") as described more fully in Attachment A-1; a tan/gold, 2015 Ford Focus, bearing California license plate number 8ZTD222 and Vehicle Identification Number ("VIN") 1FADP3F2XFL343368 ("SUBJECT VEHICLE 1") as described more fully in Attachment A-2; a black, 2011 Dodge Challenger, bearing California license plate number 9BTP484 and VIN 2B3CJ5DT2BH604371 ("SUBJECT VEHICLE 2") as described more fully in Attachment A-3; a silver, 2011 Infiniti G35, bearing California license plate number 8PCG641 and VIN JNKAY01FX6M261913 ("SUBJECT VEHICLE 3") as described more fully in Attachment A-4; the person of ALONSO, as described more fully in Attachment A-5; and the person of BERENICE SEGURA ("SEGURA"), as described more fully in Attachment A-6.

3. The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute and distribution of controlled substances), 21 U.S.C. § 846

(conspiracy to possess with intent to distribute and distribute controlled substances), 18 U.S.C. § 922(g)(1) (felon in possession of firearms and ammunition), 18 U.S.C. § 922(a)(1)(A), (B) (dealing in firearms and ammunition without a license), 18 U.S.C. § 922(o)(1) (possessing and transferring machineguns), 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 2(a), (b) (aiding and abetting), 26 U.S.C. § 5861(d) (possession of an unregistered firearm), and 26 U.S.C. § 5861(i) (possession of a firearm without a serial number) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, A-3, A-4, A-5, A-6, and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants and does not purport to set forth all my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.  All dates and times are approximate.  All drug and monetary quantities are also approximate.

## II. <u>BACKGROUND OF AFFIANT</u>

5.    I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed since September 2020.  Prior to becoming a Special Agent with ATF, I served as a Special Agent with the Naval

Criminal Investigative Service for approximately three years.  I
am currently assigned to the ATF Los Angeles Division,
Glendale V Field Office, in Glendale, California.

6.   I received a Bachelor of Science degree in Criminal
Justice from Old Dominion University in Norfolk, Virginia and a
Master of Science Degree in Criminology from Boston University
in Boston, Massachusetts.  I served in the United States Navy
and honorably separated in 2004 at the rank of Petty Officer
Second Class.  I thereafter worked for seven years with the
Federal Bureau of Investigations in Norfolk, Virginia and Los
Angeles, California.  I am a graduate of the Federal Law
Enforcement Training Center and the ATF National Academy's
Special Agent Basic Training course.

7.   As a Special Agent, I have received training in
federal firearms laws, confidential source handling, drug
identification, federal drug laws, and various surveillance and
investigative techniques.  I regularly refer to these laws and
regulations during the course of my duties and have written and
participated in the execution of several federal search and
arrest warrants in violation of these laws.  I have participated
in surveillance of individuals committing crimes of violence,
narcotics trafficking, as well as prohibited persons in
possession of firearms.

8.   During my tenure as a Special Agent, I consult
regularly with experienced investigators concerning the methods
and practices of firearms and narcotics traffickers.  Through my
experience and training, I have become familiar with the illicit

way firearms are acquired and controlled substances are imported, manufactured, distributed, and sold. I have also become familiar with the efforts of individuals engaged in the importation, smuggling, manufacturing, distribution, and sale of firearms and controlled substances to avoid detection and apprehension by law enforcement officers.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

9. From May 26, 2022, through September 21, 2022, on eight separate occasions, ALONSO sold firearms, ammunition, firearms accessories, magazines, and narcotics to persons ALONSO thought were firearms customers, but who were, in fact, either a confidential informant or undercover ATF law enforcement officers. BERENICE SEGURA (ALONSO's girlfriend) was present at four of these eight deals.

10. Between the two of them, ALONSO and SEGURA have driven either one or two of the SUBJECT VEHICLES (SUBJECT VEHICLES 1 and 2) to all eight deals, and, furthermore, have retrieved contraband, including firearms, from SUBJECT VEHICLES 1 and 2 prior to the deals.

11. ALONSO and SEGURA reside at the SUBJECT PREMISES, and SUBJECT VEHICLE 2 is registered at the SUBJECT PREMISES.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

12. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    May 2022: HSI Identifies ALONSO as a Potential Firearm/Narcotics Supplier**

13.   Based on conversations with Homeland Security Investigations ("HSI") and ATF Special Agents based in Nevada, I know that in May 2022, an HSI Confidential Informant (the "CI")[1] communicated with a known firearms and narcotics dealer, Co-Conspirator #1, who was (and still is) incarcerated in Centinela State Prison for first degree murder, via phone.  According to the CI, Co-Conspirator #1 told the CI that he could get the CI whatever s/he needs for distribution in Los Angeles.  Co-Conspirator #1 also explained to the CI that if s/he wanted guns s/he would need to come to Los Angeles to complete the purchase.

14.   On May 25, 2022, Co-Conspirator #1 called the CI and said that he had firearms for sale.  Co-Conspirator #1 and the CI then arranged for the CI to purchase three pistols and one AR-15 style rifle in Los Angeles.

**B.    May 26, 2022: ALONSO, Co-Conspirator #1, and Co-Conspirator #2 Sell Three Firearms and a High-Capacity Drum-Style Magazine to the CI**

15.   Based on my review of text messages between Co-Conspirator #1 and the CI, I know that on May 25, 2022, Co-

---

[1] HSI, ATF, and Las Vegas Metro Police Department have used the CI throughout the course of this investigation.  The CI is an undocumented non-citizen, and s/he has been granted Deferred Action Status so that s/he may cooperate in this investigation. The CI's criminal history includes arrests and charges for: (1) disorderly conduct, (2) possession of false citizenship documents, and (3) driving without a license.  The disorderly conduct and driving without a license charges were both dismissed.  The CI's criminal history also includes convictions for: (1) driving under the influence of alcohol, and (2) driving without a license.  Thus far, the CI has proven to be reliable and credible, and all information provided by the CI has been corroborated.

Conspirator #1 sent the CI Co-Conspirator #3's cellphone number
and instructed the CI to call Co-Conspirator #3 to arrange the
date, time, and location of the firearms sale.

16.  Based on my review of text messages between the CI and
Co-Conspirator #3, I know that on May 26, 2022, at 11:01 a.m.,
Co-Conspirator #3 and the CI arranged an in-person meeting at a
car wash located at 6517 Santa Fe Avenue, Huntington Park,
California 90255 (the "Carwash").

17.  On that same date, at 12:00 p.m., Co-Conspirator #3
called the CI and informed the CI that due to the police
presence at the Carwash, the sale would, instead, occur at an
AM/PM gas station located at 6400 Santa Fe Avenue, Huntington
Park, California 90255 (the "AM/PM Gas Station").

18.  Based on my review of my notes and reports, and my own
participation in the investigation, I know that on May 26, 2022,
the CI met with Co-Conspirator #2, Co-Conspirator #3, and ALONSO
at the AM/PM Gas Station.  This meeting was audio and video
recorded.[2]  Based on my conversations with the CI, my review of
the CI's audio-video recording of the meeting and transcriptions
and translations thereof, and my own personal observations as a
surveilling agent, I know the following:

a.  At 12:18 p.m., the CI arrived at the gas station.
Around that same time, Co-Conspirator #3 arrived in a blue
Toyota Corolla with Co-Conspirator #2 in the front passenger's
seat and a child in the back passenger's seat and pulled the

_____

[2] Unless otherwise indicated, all in-person meetings with
ALONSO, Co-Conspirator #1, Co-Conspirator #2, and SEGURA were
audio and video recorded.

Toyota near the CI's vehicle.  Co-Conspirator #2 and Co-Conspirator #3 stepped out of the Toyota.  Co-Conspirator #2, speaking to the CI in coded language,[3] explained that he had a 9mm on him but nothing to wrap it in.  Then, Co-Conspirator #3 grabbed a blue sweater from the trunk and placed the firearm in it prior to handing it to the CI in exchange for $900. Following the transaction, Co-Conspirator #2, and Co-Conspirator #3 departed.

        b.    At 12:37 p.m., law enforcement officers conducting surveillance saw SUBJECT VEHICLE 2 (which, at the time bore dealer temporary California plate number BN49A55) pull into the driveway of a residence located at 6427 Santa Fe Avenue, Huntington Park, California, 90255.  Shortly after parking, a Hispanic female, later identified as SEGURA,[4] exited the passenger side of SUBJECT VEHICLE 2 and ran over to SUBJECT VEHICLE 1, which was parked in front of the SUBJECT PREMISES. SEGURA retrieved what appeared to be a rifle covered by a blanket before running back and re-entering the passenger side of SUBJECT VEHICLE 2.

        c.    At 12:43 p.m., ALONSO arrived at the AM/PM Gas Station in SUBJECT VEHICLE 2 and entered the CI's vehicle. While inside of the CI's vehicle, ALONSO sold the CI: a Taurus,

_____

        [3] Unless otherwise indicated, the conversations discussed in this affidavit occurred in coded language.  Accordingly, the summary of conversations with those individuals in this affidavit are based on my training and experience and interpretation of the coded language that they used.

        [4] SEGURA was identified based on law enforcement databases, vehicle registration, and cellphone data.

G2C 9mm pistol, bearing serial number TMT06688 for $900; and an AR-15 style rifle with no serial number or identifiable markings and a high-capacity 60x5.56 drum-style magazine from under a striped blanket for $1600. During the meeting, ALONSO provided the CI with his cellphone number (the "0749 Number").[5] Prior to exiting the vehicle, ALONSO mentioned he was able to get AK-47's and ghost guns for purchase.

### C. June 9, 2022: ALONSO Sells an Undercover ATF Law Enforcement Officer ("UC-1") Two Firearms, Firearm Accessories, and Assorted Ammunition

19. Based on my review of text messages between the CI and ALONSO, and UC-1 and ALONSO, I know that from May 29, 2022, to June 9, 2022, ALONSO and the CI arranged an in-person meeting at the Carwash, at which ALONSO would sell UC-1 firearms, firearm accessories, and ammunition for $5,000.

20. Based on my conversations with UC-1 and my review of UC-1's audio-video recording of the meeting, and his/her notes and reports regarding this meeting, I know the following:

a. At 12:26 p.m., ALONSO, driving SUBJECT VEHICLE 1, arrived at the Carwash and parked in the cleaning bay furthest south. ALONSO exited the driver's side of SUBJECT VEHICLE 1 and approached UC-1's vehicle and entered on the front passenger's side. ALONSO removed a firearm from the rear pocket of his pants while explaining to UC-1 that he was waiting for the other firearms to be delivered by a third-party. ALONSO confirmed that the price was $4,000 for two handguns and one rifle.

---

[5] Unless otherwise indicated, correspondence with ALONSO occurred using this number.

b.      During the meeting, ALONSO explained that his girlfriend (SEGURA) usually drives him around when he is engaging in illegal activity because he feels that the likelihood of police contact is less.  ALONSO told UC-1 that he sells "black"[6] and "glass."[7]  UC-1 asked ALONSO what his prices were for the methamphetamine, to which ALONSO stated he sells one ounce of methamphetamine for $100 and one pound of methamphetamine for $850.

c.      ALONSO received a phone call from an unknown individual while in the presence of UC-1, and after the call, he stated to UC-1 that he stores firearms in multiple locations with associates of his.  ALONSO stated that one of the locations where firearms were being stored is Maywood, California and a secondary location is South Gate, California.  UC-1 asked ALONSO if he had any other firearms to sell now.  ALONSO stated he did and showed UC-1 a photograph of a firearm on his telephone and UC-1 asked what the price of the firearm was.  ALONSO replied $1,300, UC-1 offered $1,200 to which ALONSO agreed.

d.      UC-1 asked ALONSO if he currently had an ounce of methamphetamine with him for sale.  ALONSO stated that he did not, and further commented that he does not like to travel with methamphetamine.  UC-1 asked ALONSO if he would be willing to exchange phone numbers to which he agreed and gave UC-1 the 0749 Number and told him/her to save his name as "Luis."

---

[6] Based on my training and experience, I believe that "black" is code for heroin.

[7] Based on my training and experience, I believe that "glass" is code for methamphetamine.

e.    UC-1 asked ALONSO if s/he purchased an additional handgun and rifle from his associate what the price would be. ALONSO stated that the firearms belong to him, and he would charge $2,200.  UC-1 asked ALONSO if he had any M30 fentanyl pills for sale, and ALONSO stated that he did.  UC-1 asked what the cost would be of a "boat."[8]  ALONSO stated that he generally charged $1,300 for a "boat," but if UC-1 purchased more, he would drop the price to $1,100.

f.    ALONSO explained that his residence was just north of the meet location, pointing to the SUBJECT PREMISES. ALONSO stated that his mother lives in the front, the main house at the SUBJECT PREMISES, and that he lives in the back of the SUBJECT PREMISES on the first floor.  ALONSO also said that he is a Florencia 13 gang member.

g.    ALONSO stated that he would sell 1,000 fentanyl pills for $1,000 and still make a profit.

h.    ALONSO asked UC-1 to park in front of the SUBJECT PREMISES to which s/he agreed.  At that time, SUBJECT VEHICLE 1 was parked in the driveway.

i.    ALONSO exited and re-entered the passenger's side of UC-1's vehicle.

j.    During the second part of the meeting, ALONSO stated that the SUBJECT PREMISES belonged to his mother and that SUBJECT VEHICLE 2, which was parked in the driveway of the SUBJECT PREMISES, was his.

---

[8] Based on my training and experience, I believe "boat" is code for 1,000 fentanyl pills.

k.   ALONSO explained that he was recently released from prison for assault, and he is currently on probation and parole.[9]  ALONSO stated he is comfortable carrying a handgun-type firearm because it is easily concealable.

l.   UC-1 paid ALONSO $4,000 for the following firearms: one Taurus G3C, 9mm pistol, bearing serial number ACB507042; one Smith & Wesson M&P shield, .40 caliber pistol, bearing serial number HTK4198; and assorted ammunition located in the magazines of the firearms.

m.   UC-1 asked ALONSO what the price for the single rifle would be.  ALONSO stated $1,800 or $1,700, UC-1 replied that s/he would pay $1,500, and ALONSO agreed.  UC-1 paid $1,500 for one Springfield Saint, multi-caliber rifle, bearing serial number ST311485.  ALONSO stated that UC-1 should contact him next week for a firearm and narcotics purchase and UC-1 agreed.

**D.   June 15, 2022: ALONSO Sells UC-1 Four Firearms, a High-Capacity Drum Magazine, Assorted Rounds of Ammunition, 437 Grams of 100% Pure Methamphetamine, and 363 Grams of 99% Pure Methamphetamine**

21.  Based on my review of text messages between UC-1 and ALONSO, I know that between June 13, 2022, and June 15, 2022, ALONSO and UC-1 arranged an in-person meeting at the SUBJECT PREMISES, at which ALONSO would sell one pound of methamphetamine, 1,000 fentanyl pills, and three firearms for $7,650.

---

[9] Based on my search of law enforcement databases, I know that ALONSO is, in fact, on parole.

22.   Based on my conversations with UC-1 and my review of UC-1's audio-video recording of the meeting, and his/her notes and reports regarding this meeting, I know the following:

a.   On June 15, 2022, at 4:10 p.m., UC-1 met with ALONSO outside the SUBJECT PREMESIS, for part one of a two-part deal.  During the first part of the deal, ALONSO exited the SUBJECT PREMISES and walked over to the trunk of SUBJECT VEHICLE 1 prior to entering UC-1's vehicle, and ALONSO sold UC-1: a Polymer 80 Inc., 9 mm pistol, bearing no serial number; a Glock 19, 9mm pistol, bearing serial number BTNV306; a Taurus International PT111, 9 mm pistol, bearing serial number TVG 41172; one high-capacity 9mm drum magazine; 15 9mm assorted ammunition rounds; and 437 grams of 100% pure methamphetamine for $4,900.  ALONSO told UC-1 that he was unable to locate his key to the garage of the SUBJECT PREMISES where the AK type firearm and suspected fentanyl pills were.  ALONSO asked UC-1 to return to purchase the AK-type firearm and fentanyl pills when his mother returned home from work, following which she would grant him access to the garage.  UC-1 departed from the SUBJECT PREMISES.

b.   Hours later, at 6:35 p.m., UC-1 returned to the SUBJECT PREMISES for the second part of the deal.  During the second part of the deal, and while in UC-1's vehicle, ALONSO sold UC-1: an Izhmash Saiga, 7.62 caliber rifle, bearing serial number H06105021; 362 grams of 99% pure methamphetamine; and ten 7.62 caliber assorted ammunition for $2,400.

      c.   During the two-part meeting, ALONSO was also going to sell UC-1 approximately 1,000 fentanyl pills but, at the time of the sale, ALONSO indicated that the pills were no longer available, and that SEGURA was driving to West Covina, California to retrieve more pills.  ALONSO also stated that SEGURA, in the past, sent narcotics in the mail to different states and that she would charge $2,500 to $3,000 per shipment. ALONSO then offered to send narcotics in the mail for UC-1 to his/her customers that are located outside of Los Angeles, California.  ALONSO stated that SEGURA has a contact within the United States Postal Service who wraps the narcotics in a concealed manner as to not be detected.

    **E.   July 7, 2022: ALONSO Sells UC-1 Three Firearms, Three Gun Boxes, and Assorted Rounds of Ammunition**

    23.  Based on my review of text messages between UC-1 and ALONSO, I know that between June 20, 2022, and July 7, 2022, ALONSO and UC-1 arranged an in-person meeting at the SUBJECT PREMISES, at which ALONSO would sell firearms, gun boxes, and ammunition for approximately $11,000.

    24.  Based on my conversations with UC-1 and my review of UC-1's audio-video recording of the meeting, and his/her notes and reports regarding this meeting, I know the following:

      a.   On July 7, 2022, at 4:45 p.m., UC-1 met with ALONSO outside the SUBJECT PREMISES.  At that time, ALONSO arrived at the SUBJECT PREMISES in SUBJECT VEHICLE 2.  ALONSO then walked to the trunk of SUBJECT VEHICLE 1 and retrieved two firearms before walking to UC-1's vehicle, entering the

passenger seat, and depositing the two firearms in the car.
ALONSO then exited UC-1's vehicle, walked to the trunk of
SUBJECT VEHICLE 2, retrieved a third firearm, and re-entered UC-
1's vehicle.  Once in UC-1's car, ALONSO sold him/her: 20
assorted 9 mm ammunition rounds; a Glock GMBH 45, 9 mm pistol,
bearing serial number BVAG317; a CZ USA CZ P-10, 9 mm pistol,
bearing serial number G016593; a Nomad Defense Company, Inc.
Nomad 9, 9 mm pistol, bearing serial number N9003976; and three
gun boxes, which included assorted gun parts and magazines, for
$ 11,250.

      b.   During the meeting, ALONSO stated that "they" had
just received more M30 fentanyl pills and methamphetamine.  UC-1
asked ALONSO where they were receiving the narcotics from.
ALONSO stated that his girlfriend (SEGURA) was retrieving the
narcotics from Palmdale, California.  ALONSO also stated that,
in the past, they would drive to the "Valley" (referencing the
San Fernando Valley) but that the source at that location was no
longer their supplier.

     **F.**    **July 21, 2022: ALONSO Sells UC-1 25 Grams of 97% Pure Methamphetamine, 4,928 Fentanyl Pills, and Four Firearms, Including a Sawed-Off Short Barrel Shotgun**

     25.   Based on my review of text messages between UC-1 and
ALONSO, I know that between July 16, 2022, and July 21, 2022,
ALONSO and UC-1 arranged an in-person meeting at the SUBJECT
PREMISES, at which ALONSO would sell UC-1 narcotics and
firearms.

26. Based on my conversations with UC-1 and my review of UC-1's audio-video recording of the meeting, and his/her notes and reports regarding this meeting, I know the following:

a. On July 21, 2022, ALONSO sold UC-1: 52 grams of 97% pure methamphetamine; 4,928 fentanyl pills (574.6 grams-worth); a CZ USA CZ P-10, 9 mm pistol, bearing serial number C403685; a Glock 43x, 9mm pistol, bearing serial number AFHE914; eight rounds of Belom 9mm ammunition; a sawed-off short barrel shotgun bearing no serial number; and a Norinco MAK90, 7.62 caliber rifle, bearing serial number 42434 for $12,200.

b. Specifically, at 4:54 p.m., UC-1 arrived at the SUBJECT PREMISES.  Surveilling officers saw ALONSO exit the front door of the main house on the SUBJECT PREMISES and walk to and enter UC-1's vehicle carrying a rifle bag and a green pillow, which he had taken from the trunk of SUBJECT VEHICLE 2, which was parked in the driveway of the SUBJECT PREMISES. ALONSO then exited UC-1's car and retrieved a reusable bag from SUBJECT VEHICLE 2's trunk and walked back to UC-1'S vehicle with the bag.  The shotgun was located inside the pillow, the rifle was located inside the rifle bag, and the two handguns and narcotics were located inside of the reusable bag.  After retrieving these items, UC-1 paid ALONSO $12,200 for the firearms and narcotics.

###### G.  August 18, 2022: ALONSO Sold a Second Undercover ATF Law Enforcement Officer ("UC-2") Five Firearms, Assorted Rounds of Ammunition, Various Magazines, and 368 Grams of Fentanyl Powder

27.  Based on my review of text messages between UC-1 and ALONSO, I know that between August 5, 2022, and August 18, 2022, ALONSO and UC-1 arranged an in-person meeting at an undercover warehouse location in Los Angeles, California ("the Undercover Location") on August 18, 2022, at which ALONSO would sell UC-2 narcotics, firearms, ammunition, and magazines.  The following is a synopsis of the messages exchanged:

a.  On August 5, 2022, ALONSO contacted UC-1 and inquired if s/he was still interested in purchasing firearms as previously discussed.  UC-1 confirmed s/he was still interested.

b.  On August 8, 2022, ALONSO contacted UC-1 and inquired if s/he would be purchasing firearms and narcotics. UC-1 replied that s/he would let ALONSO know later.

c.  On August 15, 2022, ALONSO contacted UC-1 and stated that he was in possession of some "toys,"[10] "switches,"[11] "boxes of bullets,"[12] and "clips."[13]  UC-1 informed ALONSO that s/he would not be able to pick up the firearms from his

---

[10] Based on my training and experience, illegal firearms dealers will often refer to firearms as "toys."

[11] Based on my training and experience, illegal firearms dealers will often refer to machine gun conversion kits as "switches."

[12] Based on my training and experience, I believe ALONSO is using "boxes of bullets" as a term for ammunition.

[13] Based on my training and experience, illegal firearms dealers will often refer to magazines as "clips."

residence, and that ALONSO would have to deliver them.  ALONSO agreed.

       d.  On that same date, ALONSO stated that he also had a "mini ak47 automatic w the red dot reflex n an Ar15 Also automatic."  ALONSO stated that he would charge UC-1 $9,000 for the two handguns, two rifles, two machine gun conversion kits, ammunition, and extra magazines.  ALONSO stated that he was in possession of half of a kilogram of fentanyl for sale for $8,500.

       e.  On that same date, UC-1 informed ALONSO that s/he was in an accident and that his/her purchaser (UC-2) would be conducting the purchase with him instead.

       f.  On August 18, 2022, ALONSO contacted UC-1 and informed him/her that he had the firearms, machine gun conversion kits, ammunition, and narcotics ready for him/her.

    28.  On August 18, 2022, based on my observations while surveilling ALONSO, and my review of cell-site location data from both ALONSO and SEGURA's phones,[14] SEGURA (driving SUBJECT VEHICLE 2) drove in tandem with ALONSO (driving SUBJECT VEHICLE 1) to the Undercover Location and prior to the buy, the two switched vehicles, and ALONSO drove approximately 500 feet, by himself, to the Undercover Location.

    29.  Based on my conversations with UC-2 and my review of UC-2's audio-video recording of the meeting, and his/her notes and reports regarding this meeting, I know the following:

---

[14] Cell-site location data was obtained pursuant to federal warrants issued in Case Numbers 22-MJ-2851 and 22-MJ-2852.

a.   On August 18, 2022, while at the Undercover Location, ALONSO sold UC-2: a Glock model 19, 9mm pistol, bearing serial number AFUS791; firearms parts and accessories; 368 grams of fentanyl powder, a Glock model 17 gen5, 9mm pistol, bearing serial number BRNB514; a Glock model 23, .40 caliber pistol, bearing serial number BLF692; eight Winchester Western .40 caliber rounds of ammunition; a Glock model 45, 9mm pistol, bearing serial number BUVP362; a Browning model XS, Special 12 shotgun, bearing serial number 87614; a James Madison Tactical Gen 2, AR rifle, bearing no serial number; two machine gun conversion kits for pistols; three pistol magazines; two AR stile magazines; one AK-style magazine; and 66 rounds of assorted ammunition for $18,000.

**H.   September 2, 2022: ALONSO Sells UC-2 Three Machinegun Conversion Kits, One Drop In Auto Sear, Three Pistols, One Red Dot Sight, and Rounds of Assorted Ammunition**

30.   Based on my review of text messages between UC-1 and ALONSO, I know that between August 31, 2022, and September 1, 2022, ALONSO and UC-1 arranged an in-person meeting at the Undercover Location, on September 2, 2022, at which ALONSO would sell UC-2 narcotics and firearms.  The following is a synopsis of the messages exchanged:

a.   On August 31, 2022, ALONSO contacted UC-1 and informed he/her that he had firearms, machine gun conversion kits, and narcotics for sale.

b.   On September 1, 2022, ALONSO contacted UC-1 and inquired if his/her purchaser (UC-2) would be interested in more firearms to purchase.

c.   On that same date, ALONSO informed UC-1 that he had firearms, machine gun conversion kits, and ammunition ready for UC-1.

31.  Based on my observations while surveilling ALONSO, and my review of cell-site location data from ALONSO and SEGURA's cellphones, I know that ALONSO and SEGURA drove together to the Undercover Location in SUBJECT VEHICLE 2 and entered.

32.  Based on my conversations with UC-2 and my review of UC-2's audio-video recording of the meeting, and his/her notes and reports regarding this meeting, I know the following:

a.   On September 2, 2022, while at the Undercover Location, ALONSO sold UC-2: three machine gun conversion kits for pistols; one drop in auto sear for an AR-style firearm; an AR-15 style pistol bearing no serial number; an ABC Rifle Company, ABC-15 5.56 caliber pistol, bearing serial number 77-7796; a Palmetto State Armory, AK-P7 7.62 caliber pistol, bearing serial number P7-014467; a Smith & Wesson M&P Shield, 9mm pistol, bearing serial number HLV3720; one red dot sight; four rounds of assorted 9mm ammunition; 50 rounds of assorted multicaliber ammunition; 15 rounds of assorted 5.56 caliber ammunition; and 17 rounds of assorted 7.62 caliber ammunition for $9,000.

**I.   September 21, 2022: ALONSO Sells a Third and Fourth Undercover ATF Law Enforcement Officer ("UC-3" and "UC-4") Five Firearms, 11 Machine Gun Conversion Kits, and Assorted Rounds of Ammunition**

33.  Based on my review of text messages between UC-1 and ALONSO, I know that between September 6, 2022, and September 21,

2022, ALONSO and UC-1 arranged an in-person meeting at the Undercover Location, on September 2, 2022, at which ALONSO would sell UC-2[15] firearms, ammunition, and machine gun conversion kits.  The following is a synopsis of the messages exchanged:

  a.  On September 6, 2022, ALONSO contacted UC-1 and informed him/her that he had firearms for sale.

  b.  On September 7, 2022, UC-1 contacted ALONSO and told him that s/he would not be purchasing firearms from ALONSO. UC-1 stated that they (UC-2) only wanted to purchase semi-automatic firearms and machine gun conversion kits.

  c.  On September 13, 2022, ALONSO sent UC-1 several photographs depicting firearms.  UC-1 replied that s/he was unable to purchase firearms from him but would need 10 firearms the following week.  ALONSO agreed and stated he would have 10 firearms available for purchase.

  d.  On September 14, 2022, ALONSO told UC-1 that he had "5 boats of the m30's."[16]

  e.  On September 16, 2022, ALONSO told UC-1 that he had "18zips of fett same one that top shelf shit n 3 boats for the blues 13k."[17]  ALONSO also stated he had eight of the ten firearms ready to sell and would be receiving the other two later that day or the following.

---

[15] Prior to the deal, UC-2 called ALONSO and stated that s/he was unavailable and that other purchasers (UC-3 and UC-4) would be coming in his/her place.

[16] Based on my training and experience, I believe that "5 boats of the m30's" is code for 5,000 fentanyl pills.

[17] Based on my training and experience, I believe that this is code for 18 one ounce measurements of powdered fentanyl and 3,000 fentanyl laced m30 pills for sale for $13,000.

f.   On September 19, 2022, ALONSO contacted UC-1 and asked if s/he would like to purchase machine gun conversion kits.  ALONSO further stated that he had 10 for sale.

g.   On September 21, 2022, ALONSO contacted UC-1 and informed him/her that he had firearms, machine gun conversion kits, and ammunition ready for him/her.

34.  Based on my observations while surveilling ALONSO, and my review of cell-site location data from ALONSO and SEGURA's cellphones, I know that ALONSO and SEGURA drove together to the Undercover Location in a red 2018 Nissan Rogue SUV bearing California license plate 8DJD055, registered to R.E.A.  ALONSO and SEGURA both entered the Undercover Location.

35.  Based on my conversations with UC-3 and UC-4 and my review of UC-3 and UC-4's audio-video recording of the meeting, and their notes and reports regarding this meeting, I know the following:

a.   On September 21, 2022, while at the Undercover Location, ALONSO sold UC-3 and UC-4: five rounds of assorted .44 caliber ammunition; a Glock 19Gen4, 9mm pistol, bearing serial number ABFU797; a Heckler and Koch VP9, 9mm pistol, bearing serial number 224-217783; a Smith & Wesson SD40VE, .40 caliber pistol, bearing serial number FYB1835; a Taurus Tracker, .44 caliber revolver, bearing serial number JW984991; a Palmetto State Armory AK-P7, 7.62 caliber pistol, bearing serial number P7-005689; 11 machine gun conversion kits for pistols; and one 10-round 7.62x39 Magpul magazine for $10,500.

**J.    September 30, 2022, to October 25, 2022: ALONSO Agrees to Sell UC-1 Four Kilograms of Cocaine, .57 kilograms of Pressed Fentanyl, 5,000 Fentanyl Pills, and 10 Firearms to UC-1 on October 26, 2022**

36.   Based on my review of text messages between UC-1, and ALONSO, I know that from September 30, 2022, to October 25, 2022, ALONSO and UC-1 arranged an in-person meeting at the Undercover Location to occur on October 26, 2022, during which ALONSO would sell four kilograms of cocaine, approximately 0.57 kilograms of pressed fentanyl, 5,000 fentanyl laced M30 pills and 10 firearms to UC-1 for $115,000.

**K.    Drug Enforcement Administration ("DEA") Southwest Laboratory Results**

37.   Based on my review of DEA Southwest Laboratory Reports, I know the following:

a.    The crystalline substance ALONSO sold on June 15, 2022, during the first part of the deal, was approximately 437 grams of 100% pure methamphetamine (net weight).

b.    The crystalline substance ALONSO sold on June 15, 2022, during the second part of the deal, was approximately 362 grams of 99% pure methamphetamine (net weight).

c.    The powdered substance ALONSO sold on July 7, 2022, was approximately 250.17 grams of a mixture and substance containing fentanyl (net weight).

d.    The crystalline substance ALONSO sold on July 21, 2022, was approximately 52 grams of 97% pure methamphetamine (net weight).

e.    The 4,928 pills ALONSO sold on July 21, 2022, was a mixture and substance containing fentanyl that weighed approximately 574.6 grams (net weight).

f.    The powdered substance ALONSO sold on August 18, 2022, was approximately 368 grams of a mixture and substance containing fentanyl.

**L.    Interstate Nexus**

38.  Based on my review of Nexus reports, I know that on September 14, 2022 and also on October 4, 2022, ATF Interstate Nexus Expert Special Agent Christopher Stantzos examined all firearms and ammunition purchased from ALONSO between May 26, 2022, and September 21, 2022, and confirmed that the firearms and ammunition were manufactured outside of the State of California, and because the firearms and ammunition were found in California, they traveled in and affected interstate and/or foreign commerce.

**M.    ALONSO is a Convicted Felon and ALONSO Does Not Have a License to Deal Firearms**

39.  Based on my review of ALONSO's rap sheet and certified conviction records, I know that he was previously convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

a.    On or about September 9, 2016, a violation of Cal. Penal Code Section 211 (robbery), in the Superior Court for the State of California, County of Los Angeles, Case Number BA43463601; and

          b.    On or about December 16, 2020, a violation of
Cal. Penal Code Section 4501(b) (prison assault), in the
Superior Court for the State of California, County of Kern, Case
Number DF015039C.

    40.  Based on my review of records maintained by ATF,
ALONSO has not applied for or obtained a license to engage in
the business of dealing firearms.

    **N.    Investigation of the SUBJECT PREMISES and SUBJECT
          VEHICLES 1 and 2**

    41.  Based on a search of law enforcement databases, I know
that ALONSO reports the SUBJECT PREMISES as his residence and
SUBJECT VEHICLE 2 is registered to ALONSO at the SUBJECT
PREMISES.

    42.  Based on a search of law enforcement databases, I know
that SEGURA also reports the SUBJECT PREMISES as her current
residence.  SUBJECT VEHICLE 1 is registered to SEGURA, at a
California address different from the SUBJECT PREMISES.

    **O.    Surveillance of the SUBJECT PREMISES**

    43.  On October 19, 2022, ATF investigators conducted
surveillance at the SUBJECT PREMISES.

    44.  Based on my participation in the surveillance
operation, I know that at 5:30 p.m., ALONSO was at the SUBJECT
PREMISES.  At that same time, SUBECT VEHICLES 1 and 3 were
parked in the driveway.  As stated above, excluding the
September 21, 2022 deal, ATF investigators have witnessed ALONSO
and SEGURA driving and taking contraband from SUBJECT VEHICLES 1

and 2 during each of the deals.  Also, on September 20, 2022,
ALONSO offered SUBJECT VEHICLE 3 to UC-1 for purchase.

45.  On October 21, 2022, ATF investigators conducted
surveillance at the SUBJECT PREMISES.  At 3:30 p.m., ALONSO,
driving SUBJECT VEHICLE 3, arrived at the SUBJECT PREMISES.
SEGURA was in the front passenger's seat.  At that time, SUBJECT
VEHICLE 1 was parked in the driveway of the SUBJECT PREMISES.

46.  The SUBJECT PREMISES contains three separate
structures: a main house and a detached garage with a second
story above it and a guest house behind the main house.  As
stated above, ATF investigators have witnessed ALONSO exit the
main, front house on the SUBJECT PREMISES on multiple occasions
to conduct firearms transactions.  Furthermore, as stated above,
on June 9, 2022, ALONSO told UC-1 that his mother lives in the
front, main house and that he lives in the back on the first
floor of the SUBEJCT PREMISES, which I believe indicates that he
was saying he lives in either the converted garage, or the guest
house.  On June 15, 2022, ALONSO told UC-1 that he had
methamphetamine and a firearm in the garage, but the garage was
locked, and he was unable to enter it until his mother returned
with the key.

47.  ATF has conducted surveillance on the SUBJECT PREMSES
on several occasions and installed a pole camera facing the
SUBJECT PREMISES in June 2022.  Based on the surveillance and
the pole camera footage, ATF has seen ALONSO and SEGURA at the
SUBJECT PREMISES on numerous occasions, as well as other
individuals who appear to interact with and be associates of

ALONSO and SEGURA.  I have seen ALONSO and SEGURA entering the
SUBJECT PREMISES through the main, front house facing the street
multiple times a week, on a nearly daily basis.  The SUBJECT
PREMISES has three mailboxes in front of it, marked "A," "B,"
and "C."  I reviewed law enforcement databases for the SUBJECT
PREMISES, and saw that ALONSO, SEGURA, and two of the other
individuals seen at the SUBJECT PREMISES are associated with the
SUBJECT PREMISES.  Specifically, one of those individuals was
associated with "6431 Santa Fe Avenue, Apartment B, Huntington
Park California 90255."  Based on the facts set forth above, as
well as my training and experience, I believe there is probable
cause that evidence of the Subject Offenses, such as drugs,
firearms, other items related to drug-trafficking and firearms-
trafficking, and digital devices containing evidence related to
drug-trafficking and firearm-trafficking, is located within the
three structures located at the SUBJECT PREMISES.

## V. <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

48.  From my training, personal experience, and the
collective experiences related to me by other law enforcement
officers who conduct who conduct firearms investigations, I am
aware of the following:

a.    Persons who possess, purchase, or sell firearms
generally maintain records of their firearm transactions as
items of value and usually keep them in their residence, or in
places that are readily accessible, and under their physical
control, such in their digital devices.  It has been my
experience that prohibited individuals who own firearms

illegally will keep the contact information of the individual
who is supplying firearms to prohibited individuals or other
individuals involved in criminal activities for future purchases
or referrals.  Such information is also kept on digital devices
on their person and in backpacks or purses in their vicinity.

b.   Many people also keep mementos of their firearms,
including digital photographs or recordings of themselves
possessing or using firearms on their digital devices.  These
photographs and recordings are often shared via social media,
text messages, and over text messaging applications.

c.   Those who illegally possess firearms often sell
their firearms and purchase firearms.  Correspondence between
persons buying and selling firearms often occurs over phone
calls, e-mail, text message, and social media message to and
from smartphones, laptops, or other digital devices.  This
includes sending photos of the firearm between the seller and
the buyer, as well as negotiation of price.  In my experience,
individuals who engage in street sales of firearms frequently
use phone calls, e-mail, and text messages to communicate with
each other regarding firearms that the sell or offer for sale.
In addition, it is common for individuals engaging in the
unlawful sale of firearms to have photographs of firearms they
or other individuals working with them possess on their cellular
phones and other digital devices as they frequently send these
photos to each other to boast of their firearms possession
and/or to facilitate sales or transfers of firearms.

d.     Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DRUG OFFENSES

49.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.     Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.     Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c.     Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the

seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e.    Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.    Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

g.    Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking.

These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[18]

50.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such file's months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data

---

[18] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

51.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

52.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

e.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress ALONSO and/or SEGURA's thumb and/or

fingers on the device(s); and (2) hold the device(s) in front of ALONSO and/or SEGURA's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

2.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VIII.    CONCLUSION

53.   For all of the reasons described above, there is probable cause to believe that ALONSO has committed a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the premises described in Attachment A-1, the vehicles described in Attachments A-2 to A-4, and the persons described in Attachment A-5 and A-6.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 26th day of October, 2022.

_____
THE HONORABLE JOHN E. McDERMOTT
UNITED STATES MAGISTRATE JUDGE